**4**

STATE of Missouri ex rel. STATE
HIGHWAY COMMISSION,
Appellant,

v.

William S. MANN, et al., Respondents.

No. 61664.

Supreme Court of Missouri,
En Banc.

Oct. 13, 1981.

Respondent's Motion for Clarification
Overruled Dec. 8, 1981.

Bruce A. Ring, Earl H. Schrader, Jr., Milton Skeens, James B. Jackson, Mo. State Highway Commission, Kansas City, for appellant.

Clifford N. Jarrett, Bruce Heavner, Heavner, Wilkins, Jarrett & Kimball, P. C., Kansas City, for respondents.

PER CURIAM.

This is an action in eminent domain brought by the appellant, State Highway Commission of Missouri, to acquire a right of way for proposed improvement of Missouri State Highway 210 in Jackson County, Missouri. Judgment in Jackson County Circuit Court was for defendant-respondents Mr. and Mrs. William Mann, owners of the proposed right of way, in the amount of $338,550. The State Highway Commission appealed. The Missouri Court of Appeals, Western District, ordered the case transferred here so that this Court might re-examine the existing law on the use of the capitalization of income method of valuation in partial taking cases. Jurisdiction rests in this Court pursuant to Mo.Const., art. V, § 10, and Rule 83.02.

Respondents, William and Dorothy Jane Mann, are the owners of 209.6 acres of land in Jackson County, Missouri, which they purchased in 1951. The property lies between the new Missouri River channel Liberty Bend Cutoff and the old Missouri channel bend and is heavily deposited with sand of a quality which is in demand in construction work. Beginning in 1966, the Manns entered into a contract with Rulo Sand and Gravel Company, Inc., which granted Rulo the right to remove sand and gravel at a rate of 25 cents per ton on the first 25,000 tons and 20 cents on each ton in excess of that figure. In June of 1967 a similar contract was entered into with the Clarkson Construction Company. Clarkson paid at a rate of 15 cents per ton, agreed to maintain certain levees and to rehabilitate the land after the sand mining operation ceased. Of the 209.6 acres in this tract, 172.9 acres are suitable for recovery of commercial sand and gravel.

Complaints were made about the existence of this sand and gravel operation on land zoned for agricultural use and so on March 26, 1968, the Manns, Rulo, and Clarkson applied for special use permits in order to continue removing and storing the sand and gravel. The Jackson County Zoning Board notified the State Highway Commission of the special use permit request. By letter dated April 18, 1968, the Highway Commission advised that relocated Route E–210 would traverse the proposed special use area. In the face of the notification by the Highway Commission, the special use permit request was amended to exclude the proposed right of way. On July 19, 1968, a five-year special use permit was issued excluding a strip 150 feet wide designated as right of way for proposed State Route E–210. In 1973 the permit was renewed for five years, however the restrictions were increased to include a prohibition on mining within 85 feet of any boundary, including 85 feet on either side of the right of way, resulting in a total of a strip 320 feet wide set aside for the right of way. Thereafter, in 1974 the Commission filed a petition asking that the right of way be condemned for highway purposes. This was six years after the Commission's letter of 1968 regarding the location of the highway. On December 16, 1974, court-appointed commissioners assessed the damages to the Manns's property at $338,550. Both the State Highway Commission and the Manns filed exceptions.

In a pretrial stipulation the parties have agreed that the date of the taking was January 16, 1975; that the total area of the tract before the taking was 209.6 acres; that 15.8 acres were taken by the condemnation; and that the owners must provide lateral support for the right of way in a strip 85 feet wide running parallel to the road and at a 2 to 1 slope from that point to bedrock, resulting in an additional 21.79 acres from ·which excavation of sand and gravel is prohibited.

Trial was to the court without a jury. Respondents William and Dorothy Jane Mann presented expert testimony by a real estate appraiser who estimated the loss involved to be $835,400. The trial court subsequently sustained appellant's objections to respondents' expert testimony, but then reopened the matter to permit additional evidence as to value. Respondents present-

ed the testimony of an insurance company appraiser and an economist, but the trial court rejected this testimony as speculative. The court concluded that it could find evidence in the record by which it could compute the "just compensation" due respondents. The trial court found that the damages to the respondents totalled $338,550. In calculating the damages the court noted that it was exclusively using the capitalization of income method as used in *City of St. Louis v. Union Quarry & Constr. Co.*, 394 S.W.2d 300 (Mo.1965). Appellant State Highway Commission's motion to modify or, in the alternative, for a new trial was overruled. The Highway Commission appealed. The court of appeals, western district, ordered the case transferred to this Court in order that we might re-examine the existing law on the use of the capitalization of income method of valuation in this type of partial taking case.

## I

■ Appellant Highway Commission contends the property was required to be valued for agricultural purposes only because the land was zoned "agricultural" by Jackson County. The trial court permitted evidence as to value to be predicated on the use to which the land on both sides of the proposed right of way was then being put— sand and gravel mining. This use had been permitted under special use permits issued by Jackson County since July 1968. The special use permits did not include the strip of land crossing respondents' property which the appellant advised Jackson County would be needed for the highway right of way sometime in the future—as of April 1968. As previously stated, the original excluded strip was only 150 feet wide, but was subsequently enlarged in the second special use permit to 320 feet. The additional width was because of a prohibition against mining within 85 feet of a boundary or a highway right of way. The trial court found the only reason the noted strip was excluded from the special use permits was because of the appellant's actions in notifying the county board that the land would be needed for a highway easement. Mr. Ha-

rold Lambert, Director of Planning & Zoning for Jackson County, so testified.

The finding of the circuit court is supported by substantial evidence. Indeed, it would be difficult to factually conclude otherwise. And so, by the date of taking, January 16, 1975, the land on both sides of the proposed highway easement had been legally used as a sand mine and it is evident that, had it not been for the Highway Department's desires with respect to the proposed easement strip, that too would have been included in the special use permits and been legally mined. The objections of nearby residents to the sand mining had been found unavailing by Jackson County in 1968 when it issued its first sand mining permit.

■ Appellant argues the court erred in holding that there was a reasonable probability of a zoning change of the entire tract but for the proposed highway use. Whether from a technical standpoint the "zoning" would have been changed may be arguable; this because the county used "special use permits" to allow the mining rather than a "zoning" change. It is not arguable, however, whether the county would permit mining to take place over the objections of other residents because that actually happened. Nor is it even a reasonable probability that sand mining would not have been allowed on the easement strips had it not been for the desires of the Highway Commission. Clearly, the use would have been permitted.

■ The landowner is entitled to be compensated for the taking on the basis of the highest and best use of the land. *See Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934); *City of Chicago v. Equitable Life Assurance Soc'y*, 8 Ill.2d 341, 345, 134 N.E.2d 296, 299 (1956); *Forest Preserve Dist. v. Lehmann Estate, Inc.*, 388 Ill. 416, 424, 58 N.E.2d 538, 542 (1944). Surely, the use to which the land on both sides of the strip was legally being put and the use to which the right of way would have been put but for the action of the Highway Commission falls within that category.

The trial court did not err in not restricting the value of the land use to agricultural use.

## II

Appellant also contends that the respondents' deletion of the right of way from the special use permit applications made by them gave rise to a contractual obligation between respondents and the Board of Zoning Adjustment. Appellant cites no authority which would support the finding of a contractual relationship in these circumstances. This Court is not persuaded that any such relationship arose.

## III

The appellant contends the trial court erred in exclusively using the Capitalization of Income Approach in arriving at the damages in this case. There are three generally accepted approaches to estimating market value. The Cost Approach calculates the replacement value of the property. Use of the second method, the Market Approach, also known as the Comparison Approach, results in the property value being calculated by comparing it with similar properties to determine market price. The third method, the Capitalization of Income Approach, is calculated by using the net return of the property to determine a logical selling price. *See generally* 4 J. Sackman, Nichols' The Law of Eminent Domain (3d rev. ed. 1980).

In the present case the capitalization method was chosen by the trial court after twice rejecting the expert testimony on valuation offered by the Manns. In its conclusions of law, the trial court noted its reliance on *City of St. Louis v. Union Quarry & Constr. Co., supra,* in determining that the present facts merited capitalization of income treatment. The court found that the facts in this case were comparable to those in *Union Quarry* and calculated the "just compensation" due the Manns based on that case.

■ For the reasons stated *infra,* the Court holds that the capitalization of income method should not have been used here.

■ A mineral deposit is a factor to be considered in determining the fair market value of land. *See Montana Ry. v. Warren,* 137 U.S. 348, 352–53, 11 S.Ct. 96, 97, 34 L.Ed. 681 (1890); *Union Elec. Co. v. Jones,* 356 S.W.2d 857, 862 (Mo.1962); *State ex rel. State Highway Comm'n v. Moore,* 565 S.W.2d 810, 816 (Mo.App.1978); *Missouri Edison Co. v. Gamm,* 379 S.W.2d 166, 172 (Mo.App.1964). A mineral deposit or other factors affecting the market value of land, however, may not be valued separately and added together to determine the fair market value of the land. *See, e. g., United States v. 9.20 Acres of Land, More or Less, Situate in Polk County, State of Iowa,* 638 F.2d 1123, 1126 (8th Cir. 1981); *United States v. 91.90 Acres of Land, Situate in Monroe County, Missouri,* 586 F.2d 79, 87 (8th Cir. 1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *Arkansas State Highway Comm'n v. Delaughter,* 250 Ark. 990, 1000, 468 S.W.2d 242, 247 (1971); *Department of Transp. v. Toledo, P. & W. R.R.,* 59 Ill.App.3d 886, 889, 17 Ill.Dec. 195, 197, 376 N.E.2d 88, 90 (1978), *aff'd,* 75 Ill.2d 436, 27 Ill.Dec. 482, 389 N.E.2d 546, *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Townsend v. Mid-America Pipeline Co.,* 168 N.W.2d 30, 34 (Iowa 1969); *Nedrow v. Michigan-Wisconsin Pipe Line Co.,* 245 Iowa 763, 771, 61 N.W.2d 687, 691 (1953); *Lafayette Airport Comm'n v. Roy,* 265 So.2d 459, 467 (La.App. 1972), *cert. denied,* 411 U.S. 916, 93 S.Ct. 1543, 36 L.Ed.2d 307 (1973); *Iske v. Omaha Pub. Power Dist.,* 185 Neb. 724, 728–29, 178 N.W.2d 633, 637 (1970); *Hultberg v. Hjelle;* 286 N.W.2d 448, 453–55 (N.D.1979); Annot., 40 A.L.R. Fed. 656, 666–67 (1978); Annot., 156 A.L.R. 1416, 1416–18 (1945); A. Jahr, Law of Eminent Domain—Valuation and Procedure § 151 (1953); 1 L. Orgel, Valuation Under the Law of Eminent Domain § 165 (2d ed. 1953); Roberts, Condemnation of Coal, Lignite, Gravel, and Other Materials Mineable Through Surface Methods, 1979 Institute on Planning, Zoning, and Eminent Domain

369, 373 (Southwestern Legal Foundation); 4 J. Sackman, *supra*, § 13.22; 27 Am.Jur.2d Eminent Domain § 290 (1966 & Cum. Supp. 1981); 29A C.J.S. Eminent Domain § 174 (1965 & Cum. Supp. 1981). *See also* Broadbent, Eminent Domain Evaluation of Land Containing Minerals, 6 Utah L.Rev. 345, 352–55 (1959).

This Court recognized the rule that mineral deposits cannot be valued separately from the land in condemnation proceedings in *St. Louis Belt & Terminal R.R. v. Cartan Real Estate Co.*, 204 Mo. 565, 574–76, 103 S.W. 519, 521–22 (1907). *Cf. State ex rel. State Highway Comm'n v. Foeller*, 396 S.W.2d 714, 719 (Mo.1965) (where this Court recognized the above rule but held that where there had been a severance of the surface and subsurface estates by deed and the parties treated the mineral deposit as a separate estate, then the mineral deposits could be valued separately).

As stated in 4 J. Sackman, *supra*, § 13.22: [A]s in the case of vegetable growths, the rule has been correlatively stated that the value of such mineral deposits cannot be determined independently of the land of which it is a part. It cannot be considered as so much potential merchandise to be evaluated as such. *The land taken must be valued as land, with the factor of mineral deposits given due consideration.* In determining just compensation to be paid to the owner, it is not permissible to aggregate the value of the land and the value of the deposit. *Thus, the value as stone land suitable for quarrying—but not the value of the stone separate from the land—is a proper subject for consideration,* both by the witnesses and the jury in fixing the amount of just compensation to be awarded.

*Id.* at 126–29 (emphasis added) (footnotes omitted).

The rule was stated in Annot., 156 A.L.R. 1416 (1945) in the following manner:

With remarkable unanimity the courts hold that in determining the compensation in eminent domain proceedings for the land to be condemned, the existence of valuable mineral deposits in the land taken constitutes an element which may be taken into consideration if and in so far [sic] as it influences the market value of the land. The reason for this rule is that the measure of compensation in eminent domain proceedings is *the market value of the land to be condemned as a whole* with due consideration of all the components that make for its value. This rule has been expressed in a great number of decisions and has also been recognized by all the leading textwriters on this subject. It has been applied indiscriminately to all forms of mineral deposits, such as limestone, ore, gold, fire clay, coal, sand and gravel, and stone.

Occasionally the rule has been expressed by the negative statement that *the award may not be reached by separately evaluating the land and the deposits, since the latter, being only one element among many in determining the market value of the land, cannot be considered as an independent factor the value of which is to be simply added to the value of the land.*

*Id.* at 1416–18 (emphasis added) (footnotes omitted). The capitalization of income method cannot be used in this case without separating the underlying sand and gravel from the land and separately valuing the sand and gravel and that is not permissible.

One reason for the rule preventing the various factors affecting the market value of the land from being valued separately and aggregated is that this may contemplate inconsistent uses of the land. *See Kelly v. State*, 28 App.Div.2d 1177, 284 N.Y. S.2d 548, 550 (1967); *Hultberg v. Hjelle*, 286 N.W.2d 448, 456 (N.D.1979). *See also Arkansas State Highway Comm'n v. Delaughter, supra.*

Another reason for the rule preventing the various factors affecting the market value of land from being valued separately by use of the capitalization method is the speculative nature of that method for estimating market value. In the instant case, appellant's exhibit No. 1 shows that the trial court used an annuity table to capitalize the expected future income to be de-

rived from the mining operations. Annuity tables are based on a simple geometric progression.[1] As can be seen from the formula in footnote 1, the reliability of the capitalization of income method is dependent on one's ability to forecast the values of the Y, r, and n variables, i. e., one must be able to forecast the net income from the investment for each year, the market rate of interest for each year, and the number of years the investment will last. In the instant case, the trial court determined that the Y value or net income value for each year was $26,429.40,[2] the n values ranged from one to thirty-five years, and the r value or market interest rate for the investment was six percent over the entire thirty-five-year period. It was assumed that the values for the Y and r variables would remain constant over the thirty-five-year period.

Before publication of this opinion, interest rates have ranged upward from the six percent level to as high as twenty to twenty-one percent. During the same period, the federal highway building programs and

---

1. One formula for determining the present value of future income is:

$$\sum_{n} \frac{1}{(1+r_n)^n} \, Y_n, \text{ where:}$$

$n$ = a uniform period of time (in this case one year);
$Y_n$ = net income for the period; and
$r_n$ = the rate of return required to induce an investor to invest or retain capital in the project for the period.

---

An example will illustrate how this formula works. Assume that an investor desires a three-year investment (n). He wants the right to receive $100 at the end of each of the three years (Y). This investor requires a six percent rate of return in each of the three years. To find the present value of this stream of future income, the following computations would be necessary:

$$\left(\frac{1}{(1.06)} \times \$100\right) + \left(\frac{1}{(1.06)^2} \times \$100\right) + \left(\frac{1}{(1.06)^3} \times \$100\right) \text{ or}$$

$$\frac{1}{1.06} \times \$100 = \$94.34 \text{ (the present value of the first year's net income)}$$

$$+$$

$$\frac{1}{(1.06)^2} \times \$100 = \$89.00 \text{ (the present value of the second year's net income)}$$

$$+$$

$$\frac{1}{(1.06)^3} \times \$100 = \$83.96 \text{ (the present value of the third year's net income)}$$

$$\$267.30 \text{ (the present value of the net income from all three years)}$$

---

The investor would be willing to pay approximately $267.30 or less for this investment.

2. The trial court arrived at the $26,429.40 figure in the following manner. First, the trial court found that the total amount of sand and gravel recoverable in the area to be taken was 4,754,571 tons. The trial court divided this amount by 35 years, the expected lifetime of the mine, to determine the average expected amount of sand and gravel to be recovered in each year, which the trial court determined to be 132,147 tons per year. The trial court then multiplied the average expected annual amount of sand to be recovered (132,147 tons per year) by $.20 per ton, the royalty to be recovered in each of the 35 years, to arrive at an average expected annual gross revenue of $26,429.40. No expenses were considered in determining the net profit.

residential and industrial construction, which are principal sources of demand for building materials, such as sand and gravel, have come to what might be described as a "screeching halt".

This is not to say that the capitalization of income method of estimating the fair market value of land is always improper. In *City of St. Louis v. Union Quarry & Constr. Co., supra,* the state expropriated an abandoned rock quarry—a hole in the ground. The sole useful purpose of this abandoned quarry was as an income-producing landfill, a warehouse, as it were. In that case, there were no comparable sales, so the comparison method of determining the fair market value could not be used. There were no improvements on the land, so the replacement cost method of determining the fair market value could not be used—there was nothing to replace. The only accepted method of computing the market value of the land was the capitalization of income method, and its use was approved in that case as "apparently the only usable method." 394 S.W.2d at 307. The capitalization of income method was approved in *Union Quarry* as a last resort after it was found to be the only usable method.

What distinguishes the *Union Quarry* case from the present case is the fact that *Union Quarry* dealt with a *complete* taking while the present case deals with a *partial* taking. When there is a complete taking and the landowner is presently deriving income from the land by removing mineral deposits, the future stream of income that is expropriated when the land is taken begins in the present. If a partial taking occurs, however, the plans of the landowner may have contemplated beginning the mining of the area taken one year, five years, or ten years in the future. If the stream of future income that is expropriated were to begin, say, ten years in the future, this would have a substantial impact on the results derived from the capitalization of that income, because the present value discount factor ($1/(1 + r_n)^n$) decreases expo-

nentially as the number of periods increase, *i. e.,* income to be received in the remote future will have little present value as compared with the same amount of income received at a time closer to the present. Therefore, for all the reasons stated, use of the capitalization of income method where there is a partial taking is speculative. Moreover, there is sound precedent for refusing to permit the use of the capitalization of income method of valuation where there is a partial taking. *See State ex rel. State Highway Comm'n v. Southern Dev. Co.,* 509 S.W.2d 18, 27 (Mo.1974); *Shelby County R-IV School Dist. v. Herman,* 392 S.W.2d 609, 614 (Mo.1965); *Board of Pub. Bldgs. v. GMT Corp.,* 580 S.W.2d 519, 525 (Mo.App.1979).

The proper method of determining the fair market value of the land taken in this case is to consider the underlying sand as a factor affecting the fair market value of the land.

The court erred in using the capitalization of income method. The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

DONNELLY, C. J., SEILER, WELLIVER, MORGAN, BARDGETT, JJ., and STOCKARD, Special Judge, concur.

RENDLEN, J., dissents.

HIGGINS, J., not sitting.